UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
FAMILY FASHIONS, INC.,

               Plaintiff,

       - against –

STERLING JEWELERS, INC.,

           Defendant.

------------------------------X

**MEMORANDUM AND ORDER**

18 Civ. 9919 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    This breach of contract action was brought by plaintiff Family Fashions, Inc. ("Family Fashions" or "plaintiff") against defendant Sterling Jewelers, Inc. ("Sterling" or "defendant").[1] Plaintiff now moves for partial summary judgment and defendant cross moves for summary judgment.  For the following reasons, plaintiff's motion for partial summary judgment is granted in part and denied in part and defendant's motion is granted in part and denied in part.

**BACKGROUND[2]**

### I.  Contractual Relationship

    Family Fashions, a California corporation, was a "special

---

[1]    Plaintiff originally brought additional claims of fraud and violation of New York General Business Law § 349.  Those claims were dismissed on August 12, 2019.  See Memorandum & Order, ECF No. 36.

[2]    The following facts are drawn primarily from the parties' Rule 56.1 Statements and the documents submitted along with each party's briefing.  Both parties submitted a Rule 56.1 Statement of Material Facts in support of their

order" jewelry vendor that produced custom made jewelry according to customer specifications.  Pltf 56.1 ¶ 1.  Sterling, a Delaware corporation, is "a leading special retail jewelry company," which makes sales through "affiliate" jewelry stores around the country, such as Kay Jewelers, Jared, and Zales.  See Amend. Compl. ¶¶ 2, 11, ECF No. 20.  "Jewelry products sold by Sterling retailers [are] provided to Sterling by various manufacturing vendors," including Family Fashions.  Id.  Together, the two business have "had an ongoing contractual relationship as retailer (Sterling) and manufacturing vendor (Family Fashions) for decades."  Id. ¶ 19.  This dispute concerns events that took place between 2010 to 2018.

On April 5, 2010, Sterling and Family Fashions entered into the 2010 Jewelry Purchasing Terms and Conditions ("T&Cs").  See Def. 56.1 ¶ 7.  This contract describes the basic contractual obligations of each party and details Sterling's manufacturing requirements, as well as policies concerning defective merchandise and customer returns.  See 2010 T&Cs, Def. 56.1 Ex. D, ECF No. 100-4.  On October 13, 2010, the parties entered into the 2010

_____

motions for summary judgment.  See Pltf. Local Rule 56.1 Statement ("Pltf. 56.1"), ECF No. 83; Def. Local Rule 56.1 Statement ("Def. 56.1"), ECF No. 100. Both parties also submitted counter-statements to each other's Rule 56.1 Statements.  See Def. Counter-Statement to Pltf. Local Rule 56.1 Statement, ECF No. 92; Pltf. Counter-Statement to Def. Local Rule 56.1 Statement, ECF No. 107. Where the Court relies on facts drawn from any of the 56.1 Statements, it has done so because the record evidence supports the statements, no rule of evidence bars admission, and the opposing party has not disputed the facts or has not done so with citations to admissible evidence.

Third-Party Fulfillment Vendor Agreement ("2010 Fulfillment Agreement"), which governs orders and sales of Family Fashions' jewelry offered on Sterling's website ("web SKUs"). <u>See</u> Def. 56.1 ¶¶ 1-5; Pltf 56.1 ¶¶ 6-7.  The 2010 Fulfillment Agreement is a more robust agreement than the 2010 T&Cs, and it contains more detailed provisions related to each party's contractual obligations in the relationship, as well as a separate provision regarding the right of return for internet orders.  <u>See</u> 2010 Fulfillment Agreement, Def. 56.1 Ex. A, ECF No. 100-1.  Plaintiff alleges that the claims in this matter arise out of the 2010 Fulfillment Agreement, which it contends is the controlling agreement between the parties.  <u>See</u> Def. 56.1 ¶ 6; Pltf 56.1 ¶¶ 9-11.  The parties subsequently entered into additional contracts, including 2012 T&Cs; Vendor Buying Agreements ("VBAs"); and Master Supplier Manuals ("MSMs") in 2014, 2015, 2016, and 2017.  <u>See</u> Def. 56.1 ¶¶ 8-18.  These contracts further define the parties' contractual relationship, including by providing payment terms for Family Fashions' invoices.  <u>See, e.g.</u>, 2014 VBA, Def. 56.1 Ex. F, ECF No. 100-6.

In 2013, Sterling requested that Family Fashions create and supply Sterling with custom jewelry displays for Family Fashions' jewelry.  <u>See</u> Pltf. 56.1 ¶ 26.  These displays were to be placed

in Sterling's affiliate stores and used as marketing tools to entice customers to purchase Family Fashions' jewelry.  Id. ¶ 27. Each display contained an array of 30 pieces of sample custom jewelry.  Id. ¶ 26.  In total, Family Fashions paid for 1,575 displays that were then distributed to Sterling's affiliates.  Id. ¶ 33.

In January 2017, Sterling issued a letter to all of its vendors announcing that it intended to change its payment terms. See Def. 56.1 ¶ 50.  Beginning in March 2017, Sterling began to take a 2% discount for invoice payments made within 30 days of the issuance of an invoice, which it had not previously done.  See Pltf. 56.1 ¶ 19.  Pursuant to the terms of the 2016 VBA, discounts were not provided for early payment of invoices, and Sterling was "contractually required to pay Family Fashions invoices [in 2017] within 60 days."  Id. ¶ 16; 2016 VBA, Def. 56.1 Ex. I, ECF No. 100-9.  Following objections by Family Fashions, the parties entered into the 2017 VBA, which had an effective date of August 22, 2017 and formally memorialized Sterling's discount practices. Id. ¶¶ 20, 22-24.

On May 31, 2018, Sterling notified Family Fashions that it would be terminating the parties' relationship, effective July 31, 2018.  See Def. 56.1 ¶ 47.  After sending the notice of termination,

-4-

Sterling directed its affiliates to send the display sets to Family Fashions by July 25, 2018.  See Pltf. 56.1 ¶ 40.  Following this directive, Sterling sent Family Fashions 564 of the 1,575 displays, many of which were also missing sample jewelry.  Id. ¶ 43.

## II.  Return Practice

During the course of the parties' relationship, Sterling received, and sold, a large amount of Family Fashions' jewelry. At its peak, Family Fashions was "supplying Sterling with as many as a thousand custom pieces per day."  See Declaration of Ann Myer in Support of Plaintiff's Memorandum of Law in Support of Partial Summary Judgment ("Myer Decl.") ¶ 2, ECF No. 81.  As part of the vendor-retailer relationship, Sterling would also return jewelry to Family Fashions on a rolling basis when either customers had returned items within a contractually appropriate timeframe or Sterling found the jewelry to be defective or of poor quality. See Def. 56.1 ¶ 24.  In turn, Family Fashions would submit complaints regarding jewelry returns where it believed that items had been improperly returned.  Id.  For example, Family Fashions' CEO, Ann Myer ("Myer") would request reversals of chargebacks where an item was outdated or beyond repair.  Id. ¶ 25.  The returns policy was governed by the various contracts, depending on whether it was an online or an in-store purchase.  See id. ¶¶ 26-27; Pltf

56.1 ¶¶ 46-53.  In March 2017, disputes between Family Fashions and Sterling regarding returns led to the parties agreeing to "wip[e] the slate clean" and reset the terms of returns going forward.  See Def. 56.1 ¶¶ 53-57; Sept. 28, 2017 Email, Def. 56.1 Ex. S, ECF No. 100-19.

### III. Procedural Posture

On October 29, 2018, plaintiff filed the complaint in this action, alleging breach of contract, fraud, and violation of N.Y. Gen. Bus. Law § 349.  See ECF No. 7.  After defendant filed a pre-motion letter seeking leave to file a motion to dismiss, plaintiff amended the complaint.  See ECF No. 20.  On August 12, 2019, the Court granted defendant's motion to dismiss in part, dismissing the fraud and N.Y. Gen. Bus. Law claims, but allowing the breach of contract claims to proceed.  See ECF No. 36.  The parties then began discovery, which lasted until January 25, 2022.  See ECF No. 73.  Following the close of discovery, the Court held a conference regarding proposed motions for summary judgment.  On February 25, 2022, the parties filed their moving briefs, and the motion was fully briefed on April 8, 2022.  See ECF Nos. 77, 80, 102, 103.

### STANDARD OF REVIEW

Summary judgment is properly granted where "there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56. "A genuine
issue of material fact exists if 'the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.'"
Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107,
113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986)).  The moving party "always bears the
initial responsibility of informing the district court of the basis
for its motion," as well as the basis for any absence of material
fact in dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 323
(1986).  Courts must "construe the evidence in the light most
favorable to the non-moving party, and draw all reasonable
inferences in its favor."  Gilman v. Marsh & McLennan Cos., Inc.,
826 F.3d 69, 73 (2d Cir. 2016).

## DISCUSSION

Family Fashions alleges three contract breaches: (1) Sterling
improperly took a 2% discount on payments of invoices from March
2017 to August 22, 2017; (2) Sterling failed to return Family
Fashions' jewelry display units following termination of the
business relationship; and (3) Sterling violated the terms of the
2010 Fulfillment Agreement by returning jewelry outside of the 60-
day return window and failing to track customer purchase and return
information.  We address each alleged breach in turn.

-7-

### I.    2% Discounted Vendor Payments

The first alleged breach relates to Sterling's discounting of payments by 2% from March 2017 to August 22, 2017, when it made payment within 30 days of receiving an invoice.  Family Fashions claims that Sterling attempted to change the terms of the 2016 VBA, which Family Fashions states governed payment obligations at the time, without consent and thus improperly deducted $58,501.50. See Plaintiff's Reply Brief in Support of Plaintiff's Motion for Partial Summary Judgment ("Family Fashions Reply") at 3, ECF No. 102.  Sterling does not dispute that it discounted its payments, but it asserts that it was justified in doing so.  Sterling argues that it sent its vendors, including Family Fashions, a letter in January 2017 notifying them of changes in payment terms, and Family Fashions accepted the terms of the letter by continuing to conduct business with Sterling.  See Reply Memorandum in Support of Defendant's Motion for Summary Judgment ("Sterling Reply") at 22-23, ECF No. 103.

Our analysis begins by determining which contract governs, as resolution of the dispute turns on whether the 2016 VBA or Sterling's letter governed payments in 2017.  It is undisputed that the 2016 VBA controlled at least until Sterling's unilateral effort to modify its terms, and that the 2016 VBA did not provide

-8-

for any discount.  <u>See</u> Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment ("Family Fashions Mot.") at 14, ECF No. 82; Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Sterling Mot.") at 22, ECF No. 84.  Sterling argues that the January 2017 letter effectively amended the terms of the 2016 VBA.  We disagree.

> ### a. *Sterling Could Not Unilaterally Change Its Agreement With Family Fashions*

A party to a contract cannot unilaterally modify contractual terms without consent.  <u>See</u> <u>Bier Pension Plan Trust v. Estate of Schneierson</u>, 74 N.Y.2d 312, 315 (N.Y. 1989) ("Under general contract rules, an obligation may not be altered without the consent of the party who assumed the obligation."); <u>Becker v. Faber</u>, 280 N.Y. 146, 148 (N.Y. 1939) (same).  "Contract modification requires proof of each element requisite to the formation of a contract, including a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." <u>Kaplan v. Old Mut. PLC</u>, 526 Fed. Appx. 70, 71 (2d Cir. 2013) (internal quotation marks and citation omitted).  To the extent that a party relies on "course of conduct" to establish acceptance, "[t]he course of conduct must evince a meeting of the minds in order to modify the [contract]." <u>O'Grady v. BlueCrest Cap. Mgmt. LLP</u>, 111 F. Supp. 3d

494, 502 (S.D.N.Y. 2015); <u>In re Coudert Bros.</u>, 487 B.R. 375, 394 (S.D.N.Y. 2013) ("For a course of performance to demonstrate mutual assent to a modification, it must be unequivocally referable to the modification.") (internal quotation marks and citation omitted).

As both parties recognize, payments in early 2017 to Family Fashions were governed by the 2016 VBA.  The "Terms and Discount" provision of the 2016 VBA states that it is "Net 60 days" (<u>i.e.</u>, defendant was required to pay invoices within 60 days of receipt), with no discounts provided for early payment on Family Fashions' invoices.  <u>See</u> Declaration of Judith Sasaki in Support of Plaintiff's Motion for Partial Summary Judgment ("Sasaki Decl.") Ex. 4, ECF No. 79-4.  On January 31, 2017, Sterling attempted to unilaterally modify the 2016 VBA by sending all of its vendors an unsigned letter that stated that Sterling planned to implement purchase order payment term discounts going forward in which Sterling would take a 2% discount for invoices paid within 30 days, a 1% discount for invoices paid within 60 days, and pay invoices in full if it paid within 90 days.  <u>See</u> 2017 Vendor Alignment Letter, Def. 56.1 Ex. Q, ECF No. 100-17.  Family Fashions did not formally accept the letter, nor did any of its representatives sign it.  There is also no dispute that, when Sterling began to

take a 2% discount in March 2017, Family Fashions objected and told Sterling that its actions directly contradicted the terms of the 2016 VBA.  <u>See</u> Myer Decl. Ex. 20, ECF No. 81-4.  Following discussions between the parties, on August 23, 2017, Family Fashions signed the 2017 VBA, which provided for a 2% discount going forward if payment was made within 30 days of receipt of an invoice.  <u>See</u> 2017 VBA, Def. 56.1 Ex. K, ECF No. 100-11.

Given Family Fashions' actions following receipt of the January 31, 2017 letter, Sterling cannot show "proof of each element requisite to the formation of a contract."  <u>Kaplan</u>, 526 Fed. Appx. at 71.  Likewise, Sterling's claim that Family Fashions' conduct indicated acquiescence fails based on Family Fashions' clear objections to Sterling's actions.  <u>See</u> O'Grady, 111 F. Supp. 3d at 502.  We therefore grant Family Fashions summary judgment on liability on this issue.

> b. *Family Fashions' Damages are Limited to March 2017*
>    *Through August 22, 2017*

We now turn to the issue of damages.  In support of its claim, Family Fashions submitted a summary of the checks that it received from Sterling from March 16, 2017 through September 4, 2018, calculating the 2% discount attributable to each check, along with

an exemplar applied cash report.[3]  <u>See</u> Myer Decl. Ex. 22, ECF No. 81-6.  As Sterling notes in its papers, Family Fashions' requested damages are improperly calculated, as they factor in checks that were sent following August 22, 2017 and through September 2018. <u>See</u> <u>Id.</u>; Sterling Mot. at 23 n. 16.

According to the 2017 VBA, Sterling was permitted to take a 2% discount on invoice payments for invoices that it received after August 22, 2017 if it paid within 30 days.  <u>See</u> 2017 VBA at 2. The information provided by Family Fashions is simply inadequate to provide a calculation of the amount improperly deducted by Sterling.  Since the claimed damages are not cabined within the relevant time frame.  Accordingly, Family Fashions motion for summary judgment on this issue is denied without prejudice.

**II.  Display Units**

The second alleged breach concerns the ownership of "display units" provided by Family Fashions to Sterling Jewelers, which Family Fashions alleges were not returned as required.  The display

---

[3]    Defendant argues that Family Fashions has not provided a sufficient basis for the evidence regarding its damages.  Family Fashions has produced the underlying Applied Cash Reports, and Myer signed a declaration stating that these records were kept in the ordinary course of business.  <u>See</u> Myer Decl. ¶ 13.  The fact that Anna Romero, who prepared the summary, was unaware of the 2017 VBA allowing Sterling to take a 2% discount post-August 22, 2017 is of no relevance to the accuracy of the summary.  Further, Sterling should have records of the checks that it sent to Family Fashions.  If Sterling felt that the record was inaccurate, it could have supplemented the record with the documents in its possession.

units consisted of a "cardboard display with a coating on it" that was covered in "Sterling's proprietary fabric" with various removable sections, displaying 30 pieces of sample custom jewelry. See Pltf 56.1 ¶ 26; Deposition of Lee Pederson, Def. 56.1 Ex. N at 44:8-9, ECF No. 100-14; Display Invoice, Myer Decl. Ex. 24, ECF No. 81-8.  In 2012-2013, at Sterling's request, Family Fashions paid for 1,575 displays, each at a cost of $35.  See Pltf 56.1 ¶ 33.  The sample jewelry cost $12 per piece.  See Display Summary, Myer Decl. Ex. 23, ECF No. 81-7.  The display units were then shipped to various Sterling affiliate stores as a marketing tool for Family Fashions' jewelry.  See Pltf. 56.1 ¶¶ 27, 34.

Family Fashions argues that it retained ownership of the display units throughout the length of the relationship with Sterling, and that Sterling was obligated to return the units following termination.  See Family Fashions Mot. at 14.  Sterling argues that the parties agreed that it would retain ownership of the display units, which was memorialized in writing in the 2016 MSM, and that it had no obligation to return the displays.  See Sterling Mot. at 20.  Sterling further argues that Family Fashions' damages calculations are "unverifiable, unreasonable and unsubstantiated."  See Sterling Mot. at 21.

In order to resolve this dispute, we first look to the

language of the governing contracts, then to the parties' course of conduct, and finally to plaintiff's damages calculations.

> a. *The Agreements Before 2016 Do Not Provide for Ownership or Return Obligations*

As noted in Sterling's papers, the various contracts prior to 2016 do not contain any reference to ownership of the display units and do not indicate that Sterling had an obligation to return the display units to Family Fashions.  While certain contracts discuss the display units, there is no mention of ownership:

> When a specific merchandise program is developed which requires an in-store display unit, the full cost of the display will be charged to the supplier . . . prior to the development of a display unit, the supplier will be provided with a prototype (illustration) of the display and an estimate of the display cost.  In addition, the supplier will be charged for displays required for new store openings and for the replacement of displays that are obsolete due to normal wear.

2010 T&Cs, Def. 56.1 Ex. D at 10, ECF No. 100-4; 2012 T&Cs, Def. 56.1 Ex. E at 10, ECF No. 100-5.  The contracts also make no reference to shipping costs for any possible return, nor does Family Fashion address this cost in its papers.

The first time that a reference to ownership of the display units appears in writing is in the 2016 and 2017 MSMs, which state that "[i]f Seller provides an in-store display unit to Sterling for goods supplied by Seller, all property rights in the display unit are hereby transferred to Sterling."  2016 MSM, Sterling Ex.

J at 48, ECF No. 100-10; 2017 MSM, Sterling Ex. L at 53, ECF No. 100-12.  Family Fashions argues that this new language represents "an admission that, prior to the 2016 modification, Sterling did not own nor did it believe it owned any displays Family Fashions had provided before 2016."  Family Fashions Reply at 4.  Family Fashions proffers no evidence to support this claim.  Moreover, an equally plausible explanation for this modification is that Sterling sought to memorialize the existing understanding between the parties.

With no definitive answer in the language of the contracts, we look elsewhere to determine ownership of the displays.

### b. Course of Conduct

Where a contract is silent, courts look to parties' course of conduct to determine intention.  See Starr Indemn. & Liability Co. v. Brightstar Corp, 388 F. Supp. 3d 304, 329 (S.D.N.Y. 2019) ("Course of performance can also be used to fill in gaps in a contract under New York Law."); Federal Ins. Co. v. Americas Ins. Co., 258 A.D.2d 39, 44 (N.Y. App. Div. 1999) ("[T]he parties' course of performance under the contract is considered to be the most persuasive evidence of their agreed intention."); Gulf Ins. Co. v. Transatlantic Reins. Co., 69 A.D.3d 71, 85 (N.Y. Sup. Ct. 2009) ("How the parties perform a contract necessarily is

manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed.").

Here, in addition to the lack of any written agreement discussing the ownership of the display units prior to 2016, the parties' course of conduct does not support Family Fashions' position.  First, Sterling did not have a historic practice of returning display units to Family Fashions during the course of the relationship.  Second, the partial return of the display units following the termination of the relationship appears to have been a gesture of good will, rather than confirmation of any obligation by Sterling.[4]

We first look to the parties' historic practice as it relates to the display units.  There is no evidence in the record that Sterling ever returned display units to Family Fashions at any point prior to 2018.  Further, there is no record of Family Fashions requesting their return, and Family Fashions has not provided any hard evidence sufficient to raise a genuine issue of

---

[4]     Sterling also argues that Family Fashions did not list the displays in as assets in its tax returns and instead expensed them, thereby conceding ownership.  See Sterling Mot. at 20.  We see no issue with Family Fashions choosing to expense the display units when they were purchased and prepared, and we do not construe Family Fashions' tax treatment of the display units as an admission regarding ownership.

material fact to support the claim that it was monitoring or requesting returns for display units prior to the termination of the 2010 Fulfillment Agreement.

Second, while Sterling did return a portion of the display units after the relationship ended, they do not appear to have been returned based on a belief that Sterling was under an obligation to do so. Both the number of display units that were returned and the lack of any record of Family Fashions pointing to Sterling's obligation to return them supports Sterling's position.[5] There is no indication in Sterling's communication to its affiliate stores that Sterling believed that it had an "obligation" to return the displays, as Family Fashions alleges. Further, while Family Fashions has produced an "inventory record" of returned display units, this record was only created "[a]s the displays were received" in 2018, following the notice of termination of the 2010 Fulfillment Agreement. See Myer Decl. ¶ 21.

As a result, we find that Family Fashions has failed to establish that it retained ownership of the display units or that Sterling was obligated to return them. Therefore, we grant summary judgment to Sterling on this issue.

c. Damages

---

[5]     Sterling returned approximately one-third of the display units from its affiliate stores to Family Fashions. See Family Fashions Mot. at 9.

Even if Family Fashions established ownership of the display units and Sterling's return obligation, there would be serious issues with its damage calculations. In a breach of contract action under New York law, damages "must be not merely speculative, possible, and imaginary, but they must be <u>reasonably certain</u> and such only as actually follow or may follow from the breach of the contract." <u>Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.</u>, 487 F.3d 89, 110 (2d Cir. 2007) (internal quotation marks and citation omitted). "To prove general damages . . . the plaintiff must show (1) the fact or existence of damages to a "reasonable certainty" and, if the fact or existence of damages is proven, (2) a stable foundation for a reasonable estimate of damages incurred as a result of the breach." <u>Holland Loader Co. LLC v. FLSmidth A/S</u>, 769 Fed. Appx. 40, 42 (2d Cir. 2019) (internal quotation marks and citation omitted). Further, "New York courts are clear that breach of contract damages are to be measured from the date of the breach." <u>Lucente v. Int'l Business Machines Corp.</u>, 310 F.3d 243, 262 (2d Cir. 2002).

Family Fashions fails to establish a "stable foundation for a reasonable estimate of damages incurred." <u>Holland Loader</u>, 769 Fed. Appx. at 42. Most significantly, Family Fashions fails to account for the inevitable deterioration of the displays and sample

jewelry over the five years that elapsed from when the display units were purchased to when the relationship was terminated. Family Fashions admits that the displays deteriorated in quality over the years, as they were just "cardboard display[s] with a coating on [them] and after some time in the stores they would be worn, dirty, perhaps, and no further use." See Pederson Deposition Transcript, Def. 56.1 Ex. N at 44:8-11, ECF No. 100-14.  In fact, Myer stated that a number of the returned displays were thrown out because they had been damaged over the years.  See Myer Deposition Transcript, Sterling Opp'n Ex. D at 337:6-19, ECF No. 90-4.  Given the acknowledged deterioration of the displays, it is likely that similar damage also occurred to sample jewelry that was handled by customers over the years.  Nor has Family Fashions even acknowledged the cost of returns and the absence of any relevant contract provision.[6]  Thus, we find that Family Fashions' damages calculations are unsupported by the record even if Family Fashions had established liability.

### III. Returns

The third alleged breach concerns returns of jewelry by

---

[6]     In 2013, United States Postal Service commercial flat rates for Priority Mail medium and large boxes were $11.30 and $15.30, respectively.  See Field Information Kit: January 27, 2013, Domestic and International Shipping Services Price Change, https://about.usps.com/postal-bulletin/2012/pb22352/html/kit.htm (last accessed August 15, 2022).  The flat rate for Express Mail shipping was $39.95.  Id.

Sterling to Family Fashions.  Family Fashions alleges that Sterling violated its contractual obligations by improperly returning jewelry, failing to track customer purchase and return information, and returning items outside of a contractually required 60-day window.  <u>See</u> Family Fashions Mot. at 17-18.  In response, Sterling contends that it had an unlimited right of return and that the 60-day window in the 2010 Fulfillment Agreement only applied to returns by customers.  <u>See</u> Sterling Mot. at 10-14.  Moreover, Sterling relies on an agreement entered into between the parties in 2017 in order to establish a "clean slate," which resolved any pre-existing issues regarding improper returns and structured a new agreement going forward.  Sterling also argues that Family Fashions' damages calculations are unsubstantiated.

We reject Family Fashions' position for multiple reasons. First, Family Fashions fails to address the 2017 "Clean Slate" Agreement and its modification of the parties' relationship, in addition to misreading the terms of various earlier agreements. Second, Family Fashions misconstrues the indemnification provision of the 2010 Fulfillment Agreement.

### a. *Family Fashions Ignores the 2017 "Clean Slate" Agreement and Misreads Agreement Terms*

We first look to the language of the various contracts to determine the parameters of the right of return.  We start with

the 2017 "Clean Slate" Agreement.  We then examine the language of the initial agreements, as amended by the VBAs and MSMs.

### i. 2017 "Clean Slate" Agreement

The 2017 "Clean Slate" Agreement, which Family Fashions fails to adequately address in its papers, resolved outstanding disputes regarding jewelry returns and provided for a modus operandi going forward.

An announcement by Sterling in early 2017 that it was returning 396 pieces of jewelry and charging Family Fashions for the cost of shipping brought a long-simmering dispute about returns to a head.  See March 2017 Correspondence, Def. 56.1 Ex. R at 4, ECF No. 100-18.  Family Fashions both objected to the attempt to return the specific items and requested a resolution for what it perceived to be "outstanding issues with returns."  Id. at 2. Family Fashions also requested reimbursement for the chargeback that Sterling had credited.  Id. at 6-7.  In an effort to resolve the dispute, the parties engaged in negotiations to resolve all issues concerning returns and contested chargebacks.

Multiple communications throughout 2017 between the parties and preceding the 2017 Clean Slate Agreement discuss the desire to reach a "clean slate."  See August 2017 Correspondence, Def. 56.1 Ex. S at 4-7, ECF No. 100-19.  In the course of these discussions,

Sterling agreed to accept a return of damaged gold product "as a one time amnesty return to 'wipe the slate clean,'" to reconcile money owed to Family Fashions, and to remit payment of the chargeback. Id. at 2, 4.  Family Fashions indicated that the issues were "100% reconciled."  Id.

After months of negotiations, on September 26, 2017, Sterling emailed Family Fashions to "memorialize [the] agreement." September 2017 Correspondence, Def. 56.1 Ex. 20, ECF No. 100-20. This email contained a list of agreed upon terms, including that Sterling could return all silver products for any reason, as well as all gold products for any reason, although Sterling would limit the return of gold products in the future to products purchased by Sterling or a customer on or after January 1, 2017.[7]  See id.  Myer

---

[7]      Family Fashions' efforts to avoid the impact of the September 26, 2017 email fall flat. Although Myer claims that she did not intend to indicate that she agreed to these terms when she wrote "DONE" next to various items in the list, Family Fashions provides no substantiation. See Myer Deposition, Sterling Reply Ex. A at 216:12-22, ECF No. 103-1.  Myer's self-serving deposition testimony is not sufficient to create a genuine issue of material fact.  See Deebs v. Alstom Transp., Inc., 346 Fed. Appx. 654, 656 (2d Cir. 2009) ("[T]he only 'evidence' cited in plaintiffs' briefs is their own self-serving testimony and [] plaintiffs have made no attempt to square their own speculative, and subjective, testimony with the hard evidence adduced during discovery.") (internal quotation marks and citation omitted); Desir v. Bd. Of Co-op Educ. Servs. (BOCES) Nassau Cnty., 803 F. Supp. 2d 168, 176 (E.D.N.Y. 2011) ("[P]laintiff's proffered evidence is indeed based on . . . self-serving deposition testimony, and naked denials.  Plaintiff interposes this against Defendant's proffered written evidence-in the form of written evaluations, emails, and memoranda-and testimony evidence taken by deposition as to various issues of fact.").  Similarly, Family Fashions' opposition contradicts the language of the September 26, 2017 email by interpreting the email to only pertain to a handful of returns, despite the blanket language in the email and in prior correspondence.

noted that she "confirmed" that agreement.   Id.   We reproduce the
email in full.   The words in bold type were added by Family
Fashions' CEO, Ann Myer.

**From:** Fisher, Judy [mailto:Judy.Fisher@signetjewelers.com]
**Sent:** Tuesday, September 26, 2017 5:32 PM
**To:** ann@mendelsonjewels.com
**Subject:** FW: "Shine Our Star"

Hello Ann,

Per our call last week I would like to memorialize our agreement:

Family Fashions has signed the VBA under its current form. **Done.**

Per the VBA, all silver family fashion products returned to Signet by customers or for any other reason deemed unsaleable may be returned by Signet to Family Fashions. **Done.**

Per the VBA, all gold Family Fashion products returned to Signet by customers or for any other reason deemed unsaleable may be returned by Signet to Family Fashion. However, Signet will agree to limit this right to return gold products in the future to products that were purchased by Signet or the consumer on or after 1/1/2017

Signet will accept a return of gold product totaling $53,239.19 and reverse the credit that was applied to open payables. Detail attached. **Please remit immediate payment by check.**

Signet will permit family fashions a one time price increase of $5.00 for 203 skus and $9.25 for 36 skus to offset the return burden to family fashion. The additional costs will cause the Signet retail pricing to be increased. **Done.**

All requested orders from customer service will be accepted with no questions asked and fulfilled within the standard expected delivery period. **Done.**

Family Fashion will continue to work towards providing the best quality possible, with a strong focus on improved heavier silver pieces. **Done.**

Please confirm your agreement. **Confirmed** ☺

Thanks,
Judy

Thus, an objective reading of the 2017 correspondence and the
September 26, 2017 email is that the parties intended to settle
all prior disputes and formally memorialize their understanding of
the returns process moving forward.   Both sides provided
consideration, the monetary payment, and a one-time price increase

on web SKUs by Sterling and Family Fashions' acceptance of all silver and gold product returns, and both parties confirmed agreement to the terms.  In doing so, Family Fashions knowingly waived its right to dispute any of the prior returns or any returns that fit the parameters set out in the agreement.  Most importantly, Family Fashions offers no legally sufficient reason that the 2017 "Clean Slate" Agreement does not resolve this claim.

ii. <u>2010 Agreements as Modified by Later Agreements</u>

Ignoring the legal implications of the 2017 "Clean Slate" Agreement, Family Fashions instead relies on language in the earlier agreements to advance its arguments.  In doing so, it misreads the language of these operative agreements in three ways.  First, Family Fashions conflates the 2010 Fulfillment Agreement, which governs online sales, with the contracts covering in-store sales.  Second, Family Fashions offers an illogical reading of language from the 2010 Fulfillment Agreement that is both contradicted by the parties' actions and would render it unable to be modified by future agreements.  Third, plaintiff's reading of the 60-day return window provision is unworkable if applied in a real-world setting.

1. Language of the Agreements

The 2010 T&Cs, which the parties entered into on April 6, 2010, contained the principal terms for the contractual

-24-

relationship and directly addressed the return policy for Family Fashions' jewelry, imposing a 90-day window for customer returns and allowing for returns of defective merchandise.  See 2010 T&Cs at 3, 4, 6.   The parties subsequently entered into the 2010 Fulfillment Vendor Agreement on October 13, 2010, which expressly governed web SKUs.  See 2010 Fulfillment Agreement.   The 2010 Fulfillment Agreement both incorporated the terms of the 2010 T&Cs and contained a provision stating that it controlled in the event of any conflict between the two documents.  The 2010 Fulfillment Agreement also provided specific terms for customer returns of web SKUs, stating that where a customer returned a web SKU within 30 to 60 days of purchase, Sterling could return the item and enter a chargeback to Family Fashions "in exchange for a complete credit in the full amount of the purchase price."  Id. at 6.

In the following years, the parties entered into the 2012 T&Cs, see 2012 T&Cs, and in 2014 entered into annual VBAs and MSMs. See Def. 56.1 ¶¶ 10-17.   These agreements provided additional return rights, including the right to return any goods that:

> do not meet Sterling's quality control or assay processes . . . [g]oods that pass Sterling's initial quality control and assay processes but are later determined by Sterling at its sole discretion to be defective . . . [g]old or platinum items with excessive wear, damage, or alterations [and] . . . items primarily composed of contemporary metals such as titanium, tungsten, stainless steel, cobalt, and sterling silver

regardless of the condition of the items.

See, e.g., 2014 MSM, Def. 56.1 Ex. G at 41-42, ECF No. 100-7.  None of the agreements obligated Sterling to return jewelry to Family Fashions within a set period of time.

> 2. Family Fashions Conflates the March 2010 and October 2010 Agreements

Central to Family Fashions' argument is that the return provision of the 2010 Fulfillment Agreement controls all returns between the parties.  However, that is not an accurate reading of the agreements.  The 2010 Fulfillment Agreement only applies to web SKUs, and accordingly its 60-day return window does not apply to in-store purchases.  Under the terms of the 2010 T&Cs, and reaffirmed in later contracts, customers are provided a 90-day return window for in-store purchases.  See, e.g., 2010 T&Cs. Further, the MSMs granted Sterling a broad right of return, with no constraint on the time that it took to return the product to Family Fashions.  See 2014 MSM.  While provisions in the 2010 Fulfillment Agreement controlled where there was conflicting language, it is not controlling when the returns are not web SKUs and when returns were made based on Sterling's determination of defective quality.  As a result, Family Fashions' focus on the 2010 Fulfillment Agreement is misplaced, as it only covered a portion of jewelry returns.

In order to accurately contest Sterling's returns, Family Fashions would have to show that the jewelry in question did not meet the conditions listed above in the various MSMs as acceptable reasons for return or were returned outside of either the 60-day web SKU window or 90-day in-store window.  Family Fashions has not presented any such evidence to the Court.

### 3. Family Fashions Presents an Unworkable Reading of the 2010 Fulfillment Agreement

In addition to conflating the terms of the various agreements, Family Fashions advances an interpretation of the 2010 Fulfillment Agreement that would render it impossible to modify.  Family Fashions emphasizes the language in the 2010 Fulfillment Agreement that it controls in the event of any conflict.  Yet Family Fashions repeatedly signed and entered into agreements in the years following.  See, e.g., 2012 T&Cs; 2014 VBA, Def. 56.1 Ex. F, ECF No. 100-6; 2014 MSM.  These agreements modified multiple elements of the relationship, including pricing, payment terms, manufacturing requirements, and quality obligations.  Id.

If we were to take Family Fashions' legal theory to its logical conclusion, these subsequent agreements were meaningless at the time they were proposed.  In effect, the parties would have been bound by the terms of the 2010 Fulfillment Agreement for the entire duration of their relationship, regardless of whether they

wished to modify any terms of the contractual relationship.

                        4. The 60-Day Return Window Cannot Logically
                           Apply to Sterling

Finally, we examine Family Fashions' interpretation of the 60-day window as applied in a real-world setting. The 60-day timeframe in Section 6.1 of the 2010 Fulfillment Agreement enabled customers to return jewelry purchased online on the sixtieth day after purchase without issue. See 2010 Fulfillment Agreement at 5 ("Sterling provides its customers with a 30 to 60 day return/exchange guarantee") (emphasis added). Under Family Fashions' interpretation, Sterling would be obligated to return jewelry that was returned on the sixtieth day to Family Fashions that very same day. Given that any returned jewelry would have to be processed by Sterling before it could be sent back to Family Fashions, as well as the time that it would take to ship the items, Family Fashions' reading is impractical and "contrary to the reasonable expectations of the parties."[8] See Tracy Rossoll Deposition Transcript, Sterling Opp'n Ex. F at 76:5-76:25, ECF No. 90-6; Kelly Daddario Deposition Transcript, Sterling Opp'n Ex. G

---

[8]    Correspondence from Myer on February 8, 2017 also indicates that Family Fashions acknowledged that the 60-day window did not apply to Sterling and only applied to customers. See February 8, 2017 Correspondence, Sterling Opp'n Ex. E, ECF No. 90-5 ("At the inception of the E-Com program, we agreed to a 60-90-day return policy on Personalized Special Orders. Over the years, per Sterling's request, we agreed to be more lenient with the reassurance (on multiple occasions) that we would not have to take back merchandise that was over 6 months old.")

at 74:1-77:24, ECF No. 90-7; <u>Nat'l Union Fire Ins. Co. v. Monarch</u>
<u>Payroll, Inc.</u>, No. 15 Civ. 3642 (PKC), 2016 WL 634083, at *10
(S.D.N.Y Feb. 17, 2016).

Courts should construe contracts "in a manner that accords
the words their fair and reasonable meaning and achieves a
practical interpretation of the expressions of the parties."
<u>Greenwich Cap. Fin. Prods., Inc. v. Negrin</u>, 74 A.D.3d 413, 415
(N.Y. App. Div. 2010) (internal quotation marks and citation
omitted).  Thus, a contract "should not be interpreted to produce
a result that is absurd, commercially unreasonable or contrary to
the reasonable expectations of the parties."  <u>Nat'l Union Fire</u>
<u>Ins. Co.</u>, 2016 WL 634083, at *10.  Here, Family Fashions'
interpretation of Section 6.1 is contrary to any "practical
interpretation of the expression of the parties."  Accordingly, to
the extent that Family Fashions relies for its breach of contract
claim on Sterling's alleged failure to return items within 60 days,
its position must be rejected.[9]

> b. The 2010 Fulfillment Agreement's Indemnification
>    Provision Does Not Apply

---

[9]     To the extent that Family Fashions claims that Sterling failed to track
customer purchase and return information, it fails to provide any evidence.
Instead, Family Fashions relies on the testimony of Kelly Daddario to support
its claims without suggesting any reason why a Sterling employee working in the
Special Orders section should have tracked in-store returns.  <u>See</u> Family
Fashions Mot. at 11.

In addition to its breach of contract argument, Family Fashions also argues that the indemnification provision in the 2010 Fulfillment Agreement requires Sterling to indemnify Family Fashions for all losses arising out of the breach, including attorney's fees. See Family Fashions Mot. at 19-20. This argument is premised on an assumption that the indemnification provision applied to customer returns.

The provision in question, Section 7.4, states that Sterling agrees to indemnify Family Fashions in situations in which Family Fashions must defend itself from third-party claims. See 2010 Fulfillment Agreement at 7-8. Family Fashions argues that customer returns are third-party claims. See Family Fashions Mot. at 20.

This reading of the provision is illogical and contrary to law. The indemnification provision cannot be read as requiring Sterling to indemnify Family Fashions in a lawsuit filed against Sterling. See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 21 (2d Cir. 1996) (indemnification provision stating that a party "shall indemnify and save [plaintiff] harmless from any and all claims, demands or causes of action, any and all costs or expenses, including attorney fees" is "easily . . . read as limited to third party actions"); Gotham Partners, L.P. v. High River Ltd. P'ship, 76 A.D.3d 203, 204, 209

(N.Y. App. Div. 2010) ("[A] contract provision employing the language of third-party claim indemnification may not be read broadly to encompass an award of attorney's fees to the prevailing party based on the other party's breach of the contract; the provision must explicitly so state."). Moreover, the provision protects against claims "arising out of, as a result of, or relating to the breach of [the] Agreement by Sterling." See 2010 Fulfillment Agreement at 8. Family Fashions does not argue, nor can it, that customers returns were caused by a breach of the 2010 Fulfillment Agreement by Sterling.

Thus, we grant summary judgment to Sterling on this issue.

## CONCLUSION

Accordingly, for the reasons stated above, we grant Family Fashions' motion for partial summary judgment on the issue of liability regarding Sterling's improperly discounted payments from March 2017 through August 22, 2017, and we deny it on the issues of damages for Sterling's improper discount of payments and the alleged breaches of contract concerning the display units and jewelry returns. We grant Sterling's motion for summary judgment in part regarding the alleged breaches of contract concerning the display units and jewelry returns and deny it in part regarding the improperly discounted payments. The Court respectfully

directs the Clerk of the Court to close the motions pending at ECF

Nos. 77 and 80.

         **SO ORDERED.**

Dated:    New York, New York
            September 8, 2022

                              NAOMI REICE BUCHWALD
                       UNITED STATES DISTRICT JUDGE